# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
Filed: July 7, 2022

| | | |
|---|---|---|
| * * * * * * * * * * * * * * | | |
| SHARON HUGHES, | * | UNPUBLISHED |
| | * | |
| Petitioner, | * | No. 18-1895V |
| | * | |
| v. | * | Special Master Dorsey |
| | * | |
| SECRETARY OF HEALTH | * | Damages Decision; Influenza ("Flu") |
| AND HUMAN SERVICES, | * | Vaccine; Shoulder Injury Related to Vaccine |
| | * | Administration ("SIRVA"). |
| Respondent. | * | |
| | * | |
| * * * * * * * * * * * * * * | | |

Milton C. Ragsdale, Ragsdale LLC, Birmingham, AL, for petitioner.
Benjamin P. Warder, U.S. Department of Justice, Washington, DC, for respondent.

## DAMAGES DECISION[1]

On December 10, 2018, Sharon Hughes ("petitioner") filed a petition for compensation under the National Vaccine Injury Compensation Program ("Vaccine Act" or "the Program"), 42 U.S.C. § 300aa-10 et seq. (2012).[2] Petitioner alleged that she suffered a right shoulder injury related to vaccine administration ("SIRVA") as the result of an influenza ("flu") vaccination she received on October 30, 2017. Petition at 1 (ECF No. 1). A Ruling on Entitlement was issued on July 22, 2021, finding that petitioner was entitled to compensation. Ruling on Entitlement dated July 22, 2021 (ECF No. 46). The parties now seek a decision awarding damages to petitioner.

---

[1] Because this Decision contains a reasoned explanation for the action in this case, the undersigned is required to post it on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the Internet**. In accordance with Vaccine Rule 18(b), petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, the undersigned agrees that the identified material fits within this definition, the undersigned will redact such material from public access.

[2] The National Vaccine Injury Compensation Program is set forth in Part 2 of the National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755, codified as amended, 42 U.S.C. §§ 300aa-10 to -34 (2012). All citations in this Decision to individual sections of the Vaccine Act are to 42 U.S.C. § 300aa.

1

After consideration of all of the evidence, and for the reasons set forth below, the undersigned finds that petitioner is entitled to an award of damages in the amount of $100,956.12, **representing $100,000.00 for actual pain and suffering, and $956.12 for past unreimbursable expenses.**

## I.   PROCEDURAL HISTORY

On December 10, 2018, petitioner filed a petition for compensation alleging a right SIRVA injury as the result of her October 30, 2017 flu vaccination. Petition at 1. Petitioner filed medical records and a statement of completion shortly thereafter. Petitioner's Exhibits ("Pet. Exs.") 1-10; Statement of Completion, filed Feb. 5, 2019 (ECF No. 9). Petitioner subsequently filed additional medical records on December 16, 2019. Pet. Ex. 11.

On March 25, 2020, respondent filed his Rule 4(c) Report, arguing petitioner was not entitled to compensation because she had failed to provide evidence to support her "allegation that she had the onset of right shoulder pain within 48 hours of her October 30, 2017 vaccination." Respondent's Report ("Resp. Rept."), filed Mar. 25, 2020, at 9 (ECF No. 21). Petitioner filed affidavits in support of her case on July 23, 2020. Pet. Exs. 12-15. On July 30, 2020, this case was reassigned to the undersigned. Order of Reassignment dated July 30, 2020 (ECF No. 25). Petitioner was ordered to file an expert report; however, after a status conference on April 15, 2021 and party conversations about appropriate hearing dates, the parties scheduled a fact hearing for May 18, 2021. See Order dated Aug. 25, 2020 (ECF No. 28); Order dated Apr. 15, 2021 (ECF No. 36); Joint Status Rept., filed Apr. 19, 2021 (ECF No. 38). Prior to the hearing, petitioner filed additional affidavits. Pet. Exs. 16-20.

A fact hearing was held on May 18, 2021, and the undersigned issued a Ruling on Fact on June 7, 2021. Ruling on Fact dated June 7, 2021 (ECF No. 43). Respondent filed an amended Rule 4(c) Report on July 22, 2021, recommending "the Court issue an entitlement decision, which recognizes that respondent elects not to defend this case." Amended ("Am.") Resp. Rept., filed July 22, 2021, at 9 (ECF No. 45). The undersigned issued a Ruling on Entitlement the same day and issued a damages order on July 23, 2021. Ruling on Entitlement; Damages Order dated July 23, 2021 (ECF No. 47).

On December 21, 2021, petitioner filed a joint status report stating the parties were unable to resolve this claim due to differences in the parties' damages evaluation. Joint Status Rept., filed Dec. 21, 2021 (ECF No. 55). The undersigned held a status conference on January 13, 2022 and order the parties to brief the issues. Order dated Jan. 13, 2022 (ECF No. 56). Petitioner filed a damages brief on February 15, 2022 and respondent filed his damages brief on March 29, 2022. Pet. Brief ("Br.") in Support of Damages ("Pet. Br."), filed Feb. 15, 2022 (ECF No. 58); Resp. Responsive Damages Br. ("Resp. Br."), filed Mar. 29, 2022 (ECF No. 59). Petitioner filed a reply brief on April 13, 2022. Pet. Reply Br. in Support of Damages ("Pet. Reply"), filed Apr. 13, 2022 (ECF No. 60).

The issue of the appropriate award for pain and suffering damages is ripe for adjudication.

## II.   FACTUAL HISTORY

A.    **Medical History**

On October 30, 2017, petitioner received the flu vaccine in her right arm at Publix Pharmacy. Pet. Ex. 1 at 6. Petitioner had previous right shoulder pain on January 10, 2017, when she presented to Dr. Dilip Shah for right shoulder pain of the trapezius muscle. Pet. Ex. 7 at 13. That appears, however, to have been an isolated complaint, as she did not seek further care and treatment for it.

On May 1, 2018, petitioner returned to Dr. Shah due to an upper respiratory infection and low-grade fever with chills and leg aches. Pet. Ex. 7 at 15. The records of that visit do not document any complaints of right shoulder pain.

Petitioner presented to Nurse Practitioner ("NP") Anna Gully on May 17, 2018 for right arm pain following the flu shot. Pet. Ex. 4 at 3. NP Gully noted petitioner's pain had been present for six months, and was constant. Id. NP Gully documented that "[t]he right shoulder pain is described as burning, aching, and tender to touch and associated with arm pain, limited range of motion, and difficulty sleeping. The right shoulder pain [is] 5 out of 10 currently. She reports problems sleeping, difficulty with [activities of daily living], and difficulty lifting objects/weight." Id. An exam revealed positive empty can, Hawkins Impingement, and Speed's tests. Id. Petitioner's shoulder strength was approximately 4/5 and she had mostly normal range of motion, but with pain. Id. An X-ray performed at this appointment showed "mild degenerative change at the AC joint, but otherwise normal." Id. at 4-5. NP Gully ordered a magnetic resonance imaging ("MRI") on petitioner's right shoulder. Id. at 5.

On May 21, 2018, petitioner presented to Dr. Michael Patterson, orthopedic surgeon, for consultation of right shoulder impingement. Pet. Ex. 6 at 5-6. Petitioner reported pain in her shoulder for six months following the flu shot. Id. at 5. She had "pain with movement greater than 90 degrees of forward flexion and abduction." Id. After review of petitioner's X-ray and MRI, Dr. Patterson administered a Marcaine and dexamethasone injection and recommended physical therapy. Id. at 6.

Petitioner returned to NP Gully on May 23, 2018 to discuss the results of her MRI. Pet. Ex. 4 at 2. The MRI showed mild fraying of petitioner's anterior labrum, but no other definite tear was seen. Pet. Ex. 5 at 6. They discussed possible physical therapy. Pet. Ex. 4 at 2.

That same day, May 23, 2018, petitioner presented to Shelby Baptist Medical Center for Physical Therapy. Pet. Ex. 9 at 42. Upper extremity evaluation was performed by Elizabeth Smith, PT, MS, who diagnosed acute pain of the right shoulder and impingement syndrome. Id. at 44. Petitioner reported pain at a level of 6[3] and described the pain as aching, throbbing, sharp, and burning. Id. at 45. She had pain with movement and the pain was aggravated by reaching, lifting, and carrying. Id. at 53. In May and June 2018, petitioner completed eight physical

---

[3] Pain was assessed using visual analog scale ("VAS") pain score. Pet. Ex. 9 at 45. "For a numeric scale, patients are asked to rate their pain from 0 to 10 (0 = no pain; 10 = 'the worst pain ever'). For the VAS, patients make a hash mark representing their degree of pain on an unmarked 10-cm line with the left side labeled 'no pain' and the right side labeled 'unbearable pain.'" Evaluation of Pain, Merck Online Manual, https://www.merckmanuals.com/ professional/neurologic-disorders/pain/evaluation-of-pain (last visted July 5, 2022).

3

therapy appointments. Id. at 42-99. Her pain at the beginning of physical therapy was a 6, and over the course of eight visits, her pain ranged from two to four. Id. At the last visit on June 18, her VAS score was 2. Id. at 96. Petitioner's pain was exacerbated by moving, such as brushing her hair, reaching, and lifting overhead. Id. at 64, 71, 78.

On June 20, 2018, petitioner returned to see her orthopedist, Dr. Patterson. Pet. Ex. 6 at 3. Petitioner reported her pain was unchanged. Id. Dr. Patterson noted that she had positive impingement testing. Id. He documented that he had "a long discussion with the patient today regarding her symptoms. She is not much improved." Id. at 4. Dr. Patterson recommended petitioner continue her home physical therapy exercises, anti-inflammatories, and ice, and if she did not improve, they would "consider arthroscopic evaluation and decompression." Id.

Petitioner continued to have shoulder pain, and on July 17, 2018, she underwent arthroscopic subacromial decompression surgery for right shoulder impingement. Pet. Ex. 8 at 3. No complications of surgery were noted. Pet. Ex. 9 at 113. Petitioner returned to Dr. Patterson on July 31, 2018, for her post-operative appointment. Pet. Ex. 8 at 7. She was doing well and progressing with physical therapy. Id.

Petitioner completed a total of 15 physical therapy appointments after surgery, for a total of 23 appointments during the course of her injury. Pet. Ex. 9 at 195-311. At her initial post-operative physical therapy visit, she rated her pain as a 7, but this improved over time to a range of 3 and 4. Id. at 196-214. At the conclusion of physical therapy, petitioner's pain had resolved, although she continued to have problems with strength. Id. at 310-11. On September 14, 2018, Dr. Patterson reported petitioner was having no pain and had finished her physical therapy. Pet. Ex. 8 at 11.

Petitioner was allowed to return to work approximately two months after surgery. Pet. Ex. 8 at 11. She did well until December 19, 2018, when she returned to Dr. Patterson due to increasing right shoulder pain. Pet. Ex. 10 at 3. She reported "about a month or so [of] increasing pain in the right shoulder without injury or trauma. It was worse with cross arm use and overhead." Id. Dr. Patterson noted petitioner was no longer doing her exercises. Id. He recommended conservative treatment of anti-inflammatories and ice. Id. at 4. Petitioner did not seek any further treatment after this appointment.

### B.     Hearing Testimony[4]

Petitioner testified during the hearing on May 18, 2021. Petitioner is a cardiovascular technician at Shelby Baptist Hospital. Transcript ("Tr.") 6. Her professional duties include conducting stress tests, attaching heart monitors, assisting in moving patients, and performing paperwork. Tr. 6-7. On October 30, 2017, petitioner received a flu vaccination in her right arm at Publix. Tr. 7, 16. Petitioner recalled when the vaccine was administered, there was a slight burning sensation and her arm was sore. Tr. 8. Petitioner felt sore the next day when she lifted her arm to perform her regular work duties, such as washing her hands in the break room and taking patients' blood pressures during routine stress tests. Tr. 10. She also described moving patients as more difficult. Tr. 11.

---

[4] This section is taken from the Ruling on Fact issued June 7, 2021. Ruling on Fact at 3-4.

During the week after her vaccination, petitioner's arm became progressively more "achy" and her pain increased from a 2/10 to 5/10. Tr. 9, 11. Petitioner recalled having to change cars when driving to work, from a manual car to an automatic one, because shifting gears aggravated her pain. Tr. 12. Petitioner complained of her pain to her husband and multiple coworkers. Tr. 11-12.

Around the second week after the flu vaccination, petitioner's pain rating in her right arm increased to a 7/10. Tr. 15. She reported her arm was achy and sore and the area where the shot was given was warm, like a "fever." Tr. 16. In December 2017, petitioner stated that she had to cancel her plans to provide care for her daughter's children because of the pain in her arm. Tr. 18.

After vaccination, petitioner began to treat her pain with three Motrin pills twice daily and would apply ice and heat packs. Tr. 19. After her pain became gradually worse, petitioner sought medical care in May 2018. Tr. 20-22. Petitioner eventually had surgery on her shoulder. Tr. 25. She has recovered and currently has no pain. Id.

Mr. Joseph Allen Hughes, petitioner's husband, also testified at the hearing. Mr. Hughes recalled the evening after petitioner's vaccination, petitioner stated her arm was sore. Tr. 42. Mr. Hughes stated petitioner called him the next morning while driving to work and complained about shifting gears in her car. Tr. 43. A week after her vaccination, Mr. Hughes stated he was worried because his wife was still in pain. Tr. 47. Mr. Hughes stated her pain got progressively worse as time went by. Tr. 56.

Ms. Michelle Borcicky, registered nurse ("RN"), and petitioner's coworker, testified. Ms. Borcicky stated she and petitioner performed cardiac stress tests together at Shelby Baptist Hospital. While petitioner prepared the patient for the procedure, Ms. Borcicky explained what the process will be like. Tr. 59-60. The next day after the flu vaccine, petitioner told Ms. Borcicky that her arm was sore. Tr. 61. Within 48 hours, Ms. Borcicky noticed petitioner's pain increased and it was more difficult for petitioner to complete her professional responsibilities. Tr. 62.

Ms. Annette Massey, RN, another of petitioner's coworkers, testified at the hearing. Ms. Massey stated she would sometimes work with petitioner during stress tests. Tr. 74. Ms. Massey stated petitioner's arm was sore the day after vaccination. Tr. 75. Petitioner told Ms. Massey her arm was getting worse and worse. Id. Within 48 hours, Ms. Massey noticed it was painful for petitioner to reach up to prepare patients for the stress tests. Tr. 76. Ms. Massey knew petitioner was in pain, so she would not ask her to assist in moving patients, which she normally would help with. Tr. 77.

### III.   PARTIES' CONTENTIONS

Petitioner seeks an award for pain and suffering in the range of $110,000.00 to $125,000.00. Pet. Br. at 13. She asserts that an award within this range is warranted based on the severity of her pain, reaching an "excruciating" level, and requiring medical care from an orthopedist, a steroid injection, physical therapy (for a total of 23 visits), and surgery. Id. at 8-14. Petitioner had a "good recovery following surgery, and the duration of her SIRVA was around 11 months." Id. at 14.

5

Respondent proposes an award of $68,000.00 for petitioner's pain and suffering. Resp. Br. at 1. Respondent cites <u>Shelton v. Secretary of Health & Human Services</u>, as a factually similar case, as petitioner there delayed seeking treatment for five months, and then after the initial appointment, did not seek additional treatment for three more months. <u>Id.</u> at 21 (citing 19-279V, 2021 WL 2550093, at *7 (Fed. Cl. Spec. Mstr. May 21, 2021). The petitioner in <u>Shelton</u> then had physical therapy, three injections, an MRI, and surgery. <u>Shelton</u>, 2021 WL 2550093 at *7. The Chief Special Master in <u>Shelton</u> found the petitioner's delay in seeking treatment, and subsequent gap in treatment after the initial visit, suggested that petitioner's pain was less severe, and weighed in favor of more moderate award of $97,500.00 for pain and suffering. <u>Id.</u> at *9. Moreover, in <u>Shelton</u>, petitioner made a good recovery following surgery and physical therapy. <u>Id.</u> at *8.

In response, petitioner notes that respondent's suggested award of $68,000.00 is less than the amount awarded in <u>Shelton</u>, and that there is "nothing to indicated that a reasonable pain and suffering award for Ms. Hughes would amount to less than the <u>Shelton</u> court awarded," especially given that respondent did not cite any cases to support the lower amount. Pet. Reply at 4. Petitioner cites the case of <u>Vaccaro v. Secretary of Health & Human Services,</u> where petitioner was awarded $110,000.00, even though she delayed seeking treatment for three months, and once she did seek treatment, she had an unsuccessful steroid injection, surgery, three months of physical therapy, and experienced pain for eight months. <u>Id.</u> at 4-5 (citing No. 19-1883V, 2022 WL 662550, at *5 (Fed. Cl. Spec. Mstr. Feb. 2, 2022). Ms. Vaccaro ultimately had a good recovery. <u>Vaccaro</u>, 2022 WL 662550 at *5. Here, petitioner asserts that delay in seeking treatment is only one factor to consider in determining the appropriate award of pain and suffering. Pet. Reply at 5.

**IV.    LEGAL FRAMEWORK**

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." § 15(a)(4). Additionally, petitioner may recover "actual unreimbursable expenses incurred before the date of judgment," including those that "(i) resulted from the vaccine-related injury for which petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other remedial care, rehabilitation . . . determined to be reasonably necessary." § 15(a)(1)(B). Petitioner bears the burden of proof with respect to each element of compensation requested. <u>Brewer v. Sec'y of Health & Hum. Servs.</u>, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

There is no formula for assigning a monetary value to a person's pain and suffering and emotional distress. <u>I.D. v. Sec'y of Health & Hum. Servs.</u>, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("Awards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula."); <u>Stansfield v. Sec'y of Health & Hum. Servs.</u>, No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("[T]he assessment of pain and suffering is inherently a subjective evaluation."). Factors to be considered when determining an award for pain and suffering include: (i) awareness of the injury; (ii) severity of the injury; and (iii) duration of the suffering. <u>I.D.</u>, 2013 WL 2448125, at *9 (quoting <u>McAllister v. Sec'y of Health & Hum. Servs.</u>, No. 91-1037V, 1993 WL 777030, at

6

*3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), vacated and remanded on other grounds, 70 F.3d 1240 (Fed. Cir. 1995)).

The undersigned may look to prior pain and suffering awards to aid in the resolution of the appropriate amount of compensation for pain and suffering in this case. See, e.g., Doe 34 v. Sec'y of Health & Hum. Servs., 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case"). The undersigned may also rely on her experience adjudicating similar claims.[5] Hodges v. Sec'y of Health & Hum. Servs., 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims). Importantly, however, it must also be stressed that pain and suffering is not determined based on a continuum. See Graves v. Sec'y of Health & Hum. Servs., 109 Fed. Cl. 579 (2013).

In Graves, Judge Merrow rejected the special master's approach of awarding compensation for pain and suffering based on a spectrum from $0.00 to the statutory $250,000.00 cap. Judge Merrow noted that this constituted "the forcing of all suffering awards into a global comparative scale in which the individual petitioner's suffering is compared to the most extreme cases and reduced accordingly." Graves, 109 Fed. Cl. at 589-90. Instead, Judge Merrow assessed pain and suffering by looking to the record evidence, prior pain and suffering awards within the Vaccine Program, and a survey of similar injury claims outside of the Vaccine Program. Id. at 595.

Although this case was not assigned to the Special Processing Unit ("SPU"), the undersigned finds statistical data from SIRVA cases resolved in SPU to be informative, as they have an extensive history of informal resolution within the SPU.[6]

## V.   PRIOR SIRVA COMPENSATION WITHIN SPU

### A.   Data Regarding Compensation in SPU SIRVA Cases

SIRVA cases have an extensive history of informal resolution within the SPU. As of July 1, 2022, 2,723 SPU SIRVA cases have resolved since the inception of SPU on July 1, 2014. Compensation was awarded in 2,651 of these cases, with the remaining 72 cases dismissed.

---

[5] From July 2014 until September 2015, the Special Processing Unit ("SPU") was overseen by former Chief Special Master Vowell. For the next four years, until September 30, 2019, all SPU cases, including the majority of SIRVA claims, were assigned to undersigned as the former Chief Special Master, now Special Master Dorsey. Since October 1, 2019, all SPU cases, including SIRVA claims have been assigned to Chief Special Master, Brian Corcoran.

[6] Prior decisions awarding damages, including those resolved by settlement or proffer, are made public and can be searched on the U.S. Court of Federal Claims' website by keyword and/or by special master. On the Court's main page, click on "Opinions/Orders" to access the database. All figures included in this Decision are derived from a review of the decisions awarding damages within SPU. All decisions reviewed are, or will be, available publicly. All figures and calculations cited are approximations.

Of the compensated cases, 1,513 SPU SIRVA cases involved a prior ruling that petitioner was entitled to compensation. In only 114 of these cases was the amount of damages determined by a special master in a reasoned decision. These written decisions setting forth such determinations, prepared by neutral judicial officers (the special masters themselves), provide the most reliable precedent setting forth what similarly-situated claimants should also receive.[7]

1,371 of this subset of post-entitlement determination, compensation-awarding cases, were the product of informal settlement—cases via proffer and 28 cases via stipulation. Although all proposed amounts denote an agreement reached by the parties, those presented by stipulation derive more from compromise than any formal agreement or acknowledgment by respondent that the settlement sum itself is a fair measure of damages. Of course, even though any such informally-resolved case must still be approved by a special master, these determinations do not provide the same judicial guidance or insight obtained from a reasoned decision. But given the aggregate number of such cases, these determinations nevertheless "provide some evidence of the kinds of awards received overall in comparable cases." Sakovits v. Sec'y of Health & Hum. Servs., No. 17-1028V, 2020 WL 3729420, at *4 (Fed. Cl. Spec. Mstr. June 4, 2020) (emphasis in original).

The remaining 1,138 compensated SIRVA cases were resolved via stipulated agreement of the parties without a prior ruling on entitlement. These agreements are often described as "litigative risk" settlements, and thus represent a reduced percentage of the compensation which otherwise would be awarded. Due to the complexity of these settlement discussions, many which involve multiple competing factors, these awards do not constitute a reliable gauge of the appropriate amount of compensation to be awarded in other SPU SIRVA cases.

The data for all groups described above reflect the expected differences in outcome, summarized as follows:

|  | **Damages Decisions by Special Master** | **Proffered Damages** | **Stipulated Damages** | **Stipulated[8] Agreement** |
|---|---|---|---|---|
| **Total Cases** | *114* | *1,371* | *28* | *1,138* |
| **Lowest** | $40,757.91 | $25,000.00 | $45,000.00 | $5,000.00 |
| **1st Quartile** | $72,354.81 | $67,472.00 | $90,000.00 | $40,000.00 |
| **Median** | **$102,479.12** | **$86,927.85** | **$122,886.42** | **$60,000.00** |
| **3rd Quartile** | $125,343.45 | $115,000.00 | $161,001.79 | $115,000.00 |
| **Largest** | $265,034.87 | $1,845,047.00 | $1,500,000.00 | $550,000.00 |

---

[7] See, e.g., Sakovits v. Sec'y of Health & Hum. Servs., No. 17-1028V, 2020 WL 3729420, at *4 (Fed. Cl. Spec. Mstr. June 4, 2020) (discussing the difference between cases in which damages are agreed upon by the parties and cases in which damages are determined by a special master).

[8] Two awards were for an annuity only, the exact amounts which were not determined at the time of judgment.

B.  **Pain and Suffering Awards in Reasoned Decisions**

In the 114 SPU SIRVA cases which required a reasoned damages decision, compensation for a petitioner's actual or past pain and suffering varied from $40,000.00 to $210,000.00, with $100,000.00 as the median amount. Only five of these cases involved an award for future pain and suffering, with yearly awards ranging from $250.00 to $1,500.00.[9]

In cases with lower awards for past pain and suffering, many petitioners commonly demonstrated only mild to moderate levels of pain throughout their injury course. This lack of significant pain is often evidenced by a delay in seeking treatment—over six months in one case. In cases with more significant initial pain, petitioners experienced this greater pain for three months or less. All petitioners displayed only mild to moderate limitations in range of motion, and MRI imaging showed evidence of mild to moderate pathologies such as tendinosis, bursitis, or edema. Many petitioners suffered from unrelated conditions to which a portion of their pain and suffering could be attributed. These SIRVAs usually resolved after one to two cortisone injections and two months or less of physical therapy. None required surgery. The duration of the injury ranged from six to 30 months, with most petitioners averaging approximately nine months of pain. Although some petitioners asserted residual pain, the prognosis in these cases was positive. Only one petitioner provided evidence of an ongoing SIRVA, and it was expected to resolve within the subsequent year.

Cases with higher awards for past pain and suffering involved petitioners who suffered more significant levels of pain and SIRVAs of longer duration. Most of these petitioners subjectively rated their pain within the upper half of a ten-point pain scale and sought treatment of their SIRVAs more immediately, often within 30 days of vaccination. All experienced moderate to severe limitations in range of motion. MRI imaging showed more significant findings, with the majority showing evidence of partial tearing. Surgery or significant conservative treatment, up to 133 physical therapy sessions over a duration of more than three years and multiple cortisone injections, was required in these cases. In four cases, petitioners provided sufficient evidence of permanent injuries to warrant yearly compensation for future or projected pain and suffering.

VI.  **APPROPRIATE COMPENSATION IN THIS SIRVA CASE**

A.  **Actual Pain and Suffering**

In this case, awareness of the injury is not disputed. The record reflects that at all times petitioner was a competent adult with no impairments that would impact her awareness of her injury. Therefore, the undersigned analyzes the severity and duration of petitioner's injury.

When performing this analysis, the undersigned reviews the record as a whole, including the medical records, affidavits, testimony, and any expert opinions. The undersigned also takes into account prior awards for pain and suffering in both SPU and non-SPU SIRVA cases, as well

---

[9] Additionally, a first-year future pain and suffering award of $10,000.00 was made in one case. Dhanoa v. Sec'y of Health & Hum. Servs., No. 15-1011V, 2018 WL 1221922 (Fed. Cl. Spec. Mstr. Feb. 1, 2018).

9

as her experience adjudicating these cases. The undersigned bases her decision as to the appropriate amount of damages on the particular facts and circumstances of this specific case.

The parties comparables were helpful in determining a reasonable award of pain and suffering. The Vaccaro case, cited by petitioner, was factually similar, given that there was a delay, albeit a shorter period of time (three months), the petitioner had one steroid injection, and experienced pain for eight months. 2022 WL 662550 at *5. Ms. Vaccaro also had surgery and had physical therapy visits (28) that were similar. Id. Ms. Vaccaro was awarded $110,000.00 for her pain and suffering. Id. at *6. In determining an appropriate award, the Chief Special Master took into account Ms. Vaccaro's delay in seeking treatment, but noted that "the overall course thereafter underscores that the injury was serious enough to warrant persistent medical attention." Id. at *7. The same is true here. As compared to Ms. Vaccaro, Ms. Hughes had a more extended delay prior to seeking treatment, but then she had one steroid injection (which did not offer any permanent relief), and she required surgery. Further, Ms. Hughes' injury lasted slightly longer than Ms. Vaccaro's, by approximately three months (total of 11 months).

The Shelton case cited by respondent is also factually similar. 2021 WL 2550093. Ms. Shelton had a delay of five months in seeking treatment, followed by another gap of three months before she sought additional treatment. Id. at *4. She had three steroid injections, which offered some relief, but ultimately had arthroscopic surgery and attended 26 physical therapy session. Id. at *7. The duration of Ms. Shelton's injury was 15 months. Id. Her pain was moderately severe and fluctuated over time, with periods of lower levels of pain. Id. Ms. Shelton was awarded $97,500.00 for her pain and suffering. Ms. Hughes clinical course is distinguished by a longer initial delay in seeking treatment, but once she did seek treatment, there were no gaps in her care.

Another similar case cited by petitioner is Knudson,[10] where petitioner received $110,000.00 for pain and suffering. Knudson v. Sec'y of Health & Hum. Servs., No. 17-1004V, 2018 WL 6293381 (Fed. Cl. Spec. Mstr. Nov. 7, 2018). Her clinical course was similar to Ms. Hughes, in that her pain levels were similar, she had surgery, but only attended nine physical therapy appointments, and had 95% improvement within six months. Id. at *8. The duration of her treatment was approximately nine months. Id.

While the above cases are similar, the current case is unique. Ms. Hughes is a cardiovascular technician at a hospital. A number of her duties in that role are physical and require the use of her arm and shoulder. She assists in performing stress tests, attaching heart monitors, monitoring vital signs, and moving patients. Petitioner's co-workers described her difficulties performing her work duties due to shoulder pain from her SIRVA. The impact of petitioner's injury on her employment is one factor the undersigned has considered in determining a reasonable award.

---

[10] Petitioner cited additional cases, including Collado, where $120,000.00 was awarded for actual pain and suffering, and Dobbins, where $125,000.00 was awarded. Collado v. Sec'y of Health & Hum. Servs., No. 17-0225V, 2018 WL 3433352 (Fed. Cl. Spec. Mstr. June 6, 2018); Dobbins v. Sec'y of Health & Hum. Servs., No. 16-0854V, 2018 WL 4611267 (Fed. Cl. Spec. Mstr. Aug. 15, 2018). However, petitioners in these other cases had more severe pain, more pronounced pathology, or required more extensive rehabilitation, as evidenced by their medical records. Thus, they are not as factually similar as the cases discussed by the undersigned above.

Another factor the undersigned has considered is petitioner's delay in seeking treatment. Although she attempted to self-treat for six months, once she did seek treatment, petitioner consistently reported that her pain had been present since her flu shot (six months). She rated her pain as 5 and 6 out of 10, and described it as aching, throbbing, sharp, and burning. Although her pain levels improved with physical therapy, she ultimately required arthroscopic surgery. Post-operatively, her pain levels were moderate to severe, initially rated as a 7 out of 10, but this improved over time. By September 14, 2018, petitioner completed physical therapy and was having no pain. She had a relapse, however, and returned to see her orthopedist on December 19, 2018, reporting that she had been in pain for one month. Again, her pain increased with movement. Dr. Patterson recommended anti-inflammatory medication and ice. Thus, petitioner's clinical course, as documented in the medical records, establish that she had soreness on the day of her vaccination (October 30, 2017), that her pain began worsening the day after her vaccination (October 31, 2017), and that she completed physical therapy and her pain had resolved by September 14, 2018. Her pain returned, and when she saw Dr. Patterson on December 19, 2018, she had again had pain for one month. Although the petitioner states that she had pain for 11 months, the cumulative duration of petitioner's pain was approximately 12 months.

In summary, the petitioner had moderately severe pain, with periods of improvement, as well as times when the pain was more severe. The fact that petitioner delayed in seeking treatment for six months is a factor to consider, as it indicates that petitioner's pain was not so severe as to require immediate treatment. However, once she did seek treatment, she reported moderately severe pain. Her pain levels fluctuated during treatment, and increased and decreased, until her injury resolved. Moreover, petitioner's injury was severe enough to warrant surgery, which substantially impacts the value of her award.

Based upon all of the facts and circumstances here, **the undersigned awards $100,000.00 in compensation for petitioner's actual pain and suffering.** Petitioner does not seek compensation for future pain and suffering, and the evidence does not support such damages.

### B.  Award for Past Unreimbursed Expenses

Pursuant to the Vaccine Act, petitioner is entitled to compensation for "actual unreimbursable expenses" for her vaccine-related injury which have been incurred for "medical or other remedial care determined to be reasonably necessary." § 15(a)(1)(A); Young v. Sec'y of Health & Hum. Servs., No. 15-1241V, 2019 WL 396981, at *8 (Fed. Cl. Spec. Mstr. Jan. 4, 2019); Murray v. Sec'y of Health & Hum. Servs., No. 18-0534V, 2020 WL 4522483, at *5 (Fed. Cl. Spec. Mstr. July 6, 2020); Fry v. Sec'y of Health & Hum. Servs., No. 18-1091V, 2020 WL 8457671, at *5 (Fed. Cl. Spec. Mstr. Dec. 16, 2020).

Here, in addition to an award for actual pain and suffering, petitioner also seeks compensation for reimbursement of past out-of-pocket expenses for reasonable and necessary costs of medical care and treatment in the amount of $792.14, and mileage costs in the amount of $163.98, for a total of $956.12. Pet. Ex. 21; Pet. Br. at 14.

Respondent does not object to petitioner's claim for mileage costs of $163.98, but asserts that the "properly documented amount of petitioner's claimed past out-of-pocket expenses is $536.42." Resp. Br. at 1, n.1. Respondent, however, does not explain why he asserts that petitioner has failed to properly document her out-of-pocket expenses, or identify which expenses may be objectionable.

The undersigned has reviewed petitioner's documentation of unreimbursed expenses, and finds her expenses to be properly documented, as well as reasonable and necessary. Petitioner's expenses reflect her out-of-pocket payments, co-pays, and the like, for her physician visits, surgery, and physical therapy. Thus, the undersigned awards these costs in full, for a total award for reimbursement of past out-of-pocket expenses and mileage in the amount of $956.12.

## VII.   CONCLUSION

For all of the reasons discussed above and based on consideration of the record as a whole, the undersigned awards:

**A lump sum payment of $100,956.12, representing $100,000.00 for petitioner's actual pain and suffering[11] and $956.12 for related out-of-pocket medical expenses, in the form of a check payable to petitioner, Sharon Hughes.**

This amount represents compensation for all damages available under § 15(a).

The Clerk of Court is directed to enter judgment in accordance with this Decision.[12]

**IT IS SO ORDERED.**

s/Nora Beth Dorsey
Nora Beth Dorsey
Special Master

---

[11] Since this amount is being awarded for actual, rather than projected, pain and suffering, no reduction to net present value is required. See Section 15(f)(4)(A); Childers v. Sec'y of Health & Hum. Servs., No. 96-0194V, 1999 WL 159844, at *1 (Fed. Cl. Spec. Mstr. Mar. 5, 1999) (citing Youngblood v. Sec'y of Health & Hum. Servs., 32 F.3d 552 (Fed. Cir. 1994)).

[12] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.